Opinion issued August 15, 2019



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00340-CV

————————————

**SUNDANCE ENERGY, INC., Appellant**

**V.**

**NRP OIL AND GAS LLP, Appellee**

---

**On Appeal from the 125th District Court
Harris County, Texas
Trial Court Case No. 2015-47595**

---

## MEMORANDUM OPINION

Appellant, Sundance Energy, Inc. ("Sundance"), challenges the trial court's judgment entered, after a trial on damages and a bench trial on attorney's fees, in favor of appellee, NRP Oil and Gas LLP ("NRP"). In two issues, Sundance contends that the evidence is legally and factually insufficient to support the trial

court's award of attorney's fees to NRP and the evidence is legally and factually insufficient to support the jury's damages award because the jury "failed to account for uncontroverted evidence" of an offset amount.

We affirm.

## Background

In its amended petition, NRP alleged that it entered into a Purchase and Sale Agreement (the "PSA") with Sundance to purchase "Sundance's interest in certain oil and gas leases and wells located in three North Dakota counties." The parties agreed to a purchase price of "approximately $35 million." Sundance retained "the broad obligation to pay for certain pre-sale liabilities (the 'Retained Liabilities') associated with drilling, completing, and operating the wells included among the assets purchased." And, "NRP agreed to be responsible for liabilities accruing after the sale."

NRP alleged that the PSA provided:

[A]ll liabilities of Seller for capital expenses, *joint interest billings*, *lease operating expenses*, lease rentals, shut-in payments, *drilling and completion expenses*, workover expenses, geological costs, geophysical costs, *and other exploration or development expenditures and costs* (collectively, "Property Expenses") that are *assessed for or attributable to periods of time or operations during Seller's ownership of the Assets prior to the Effective Time* (regardless of whether such operations were proposed or approved after the Effective Time), including all costs and expenses relating to drilling and completion of wells proposed to and approved by Seller prior to the Effective Time (regardless of whether such drilling and completion, or the costs incurred in connection with such activities

2

> occurred before or after the Effective Time); provided, however, that Property Expenses shall not include (i) costs and expenses relating to plugging or abandonment of the Wells, which are assumed by Buyer as Assumed Liabilities regardless whether such obligations arise prior to or after the Effective Time, or (ii) costs and expenses relating to environmental matters, which are addressed exclusively in Article 6 and Article 14[.]

(alterations in original.)  The "Effective Time" is defined in the PSA as "9 a.m. (Central Standard Time) on September 1, 2013."

NRP further alleged that Sundance "agreed to cover (or reimburse NRP for) the Retained Liabilities in the indemnification provisions set forth in ¶ 14.1 of the PSA," which provided that Sundance agreed to indemnify NRP for "ALL LOSSES ARISING FROM OR COMPRISING THE RETAINED LIABILITIES."  And Sundance "further agreed that its obligation to indemnify NRP for Retained Liabilities would continue after the sale 'for a period in perpetuity.'"

Before and after the sale, NRP received a first set of joint-interest billings ("JIBs") totaling $146,000 "from companies operating wells included among" the assets purchased in the PSA.  These JIBs "requested payment for costs that pre-dated the Effective Time" and were subject to the indemnity provisions in the PSA.  NRP paid these JIBs, and later forwarded them to Sundance for reimbursement.  Sundance agreed that these JIBs were part of the Retained Liabilities and paid the requested amount of $146,000 in full.  NRP subsequently "received additional JIBs totaling approximately $900,000 for liabilities that, just

3

like the initial JIBs, were also 'assessed for or attributable to' Sundance's ownership of the Assets before the Effective Time." NRP paid the JIBs and again forwarded a request to Sundance for reimbursement pursuant to the PSA. However, Sundance refused to reimburse NRP for the additional JIBs.

NRP asserted causes of action against Sundance for breach of contract and for a declaratory judgment. It sought compensatory and actual damages, declarations, pre- and post-judgment interest, and reasonable and necessary attorney's fees pursuant to Chapters 37 and 38 of the Texas Civil Practices and Remedies Code.

In its amended answer, Sundance asserted a general denial as well as the affirmative defenses of "SETTLEMENT/RELEASE," "ENTITLEMENT TO OFFSET," "WAIVER," and "ESTOPPEL/QUASI-ESTOPPEL."

At trial, David Hartz testified that he was the vice president of the oil and gas division of NRP at the time that the PSA was signed. And he joined NRP in late 2010 to build its oil and gas division. Under Hartz's supervision, NRP became aware that Sundance had a "larger portfolio" of assets in the Williston Basin in North Dakota and Montana.

Hartz explained that Sundance's portfolio consisted of "non-operated" assets, meaning the assets were drilled, completed, produced, and administered by another partner called the "operating" partner. "The non-operator typically [was] a

4

leaseholder within the same unit or designated drilling spacing unit," which had to "approve certain operations," "give their consent to the operator" for certain operations, and then "pay their share of the invoices and then collect their share of the revenue." The majority of the wells purchased by NRP were operated by EOG Oil and Gas ("EOG").

Hartz further testified that before executing the PSA, NRP performed a great amount of due diligence to determine the value it would place upon the properties to be purchased. At that time, there was a group of wells that was being completed and NRP was "not provided information to say how much capital or how much they had paid for those operations to date." In other words, NRP was aware that there were still outstanding bills for this group of wells that would be sent by the operating partner, EOG. However, Sundance could not provide information regarding "how much was remaining on those wells to be drilled" for NRP to analyze the remaining costs for purposes of valuing the assets. Hartz explained that this information was typically provided in an "operating" statement in oil and gas transactions—"which is essentially an income statement for . . . particular properties and capital." Due to this missing information, NRP and Sundance reached a compromise where Sundance agreed to cover any remaining costs on the assets so that NRP would not "have to come out of pocket for any of this in the

5

future once [it] own[ed] the assets." Accordingly, NRP made an offer to purchase the assets, valuing the assets based on the compromise.

Hartz also testified that the PSA, which was entered into evidence, provided that Sundance had certain Retained Liabilities that it would be responsible for even after NRP owned the assets. Specifically, Hartz testified that these Retained Liabilities included: (1) expenses for large capital items such as equipment—typically related to drilling and production of a well and not ongoing maintenance; (2) JIBs—which were "essentially the bills or the invoices . . . receiv[ed] from the operator"; (3) lease operating expenses—which are "essentially the normal operating expenses," such as emptying the tank where oil was stored or electrical and water bills; (4) lease rentals if a property was leased from the government or a private landowner; (5) shut-in payments, if the land was leased, for shut-in or non-producing wells; (6) drilling completion expenses—a broad category of expenses shared by those in a partnership to drill, complete, and "put a well under production"; (7) workover expenses—which were incurred to "reestablish production" for a well when something had gone wrong; (8) geological costs, such as expenses for data "in the exploration or development of prospects"; (9) geophysical costs, such as seismic or other data collected relating to the "field of geophysics"; (10) and "other exploration or development expenditures and costs" which was a "catchall for remaining expenses." However, Sundance's

6

liability for these costs was limited to "costs that [were] assessed for or attributable to periods of time or operation during" Sundance's "ownership of the assets prior to the effective time." Hartz testified that, per the PSA, this indemnification was to continue in perpetuity. He further explained that NRP would pay for any "normal operating expenses associated with owning the assets or anything that [NRP] would approve during [its] ownership of the assets, drilling of a new well, et cetera" incurred after the effective date of the PSA, which was September 1, 2013.

Hartz explained that following execution of the PSA, NRP made several requests for "indemnification" pursuant to the PSA based on JIBs it received from EOG. The first was for $146,304.85. Sundance quickly responded to NRP's request by admitting its responsibility to cover the expenses and paid NRP the requested amount. After receiving additional JIBs from EOG, NRP again requested indemnification from Sundance. NRP made subsequent requests for reimbursement, which remained unpaid at the time of trial. In total, Hartz testified that NRP was seeking damages based on its requests for indemnification to Sundance in the amount of $988,254.

At trial, a copy of the PSA was admitted into evidence. It provides, in relevant parts, as follows:

> 4.1 <u>Closing Adjustments</u>. With respect to matters that can be determined as of the Closing, Seller shall prepare, in accordance with the provisions of this Article 4, a statement (the **"Closing Adjustment Statement"**) with relevant supporting information

7

setting forth each adjustment to the Base Purchase Price submitted by Seller in accordance with this Agreement. Seller shall submit the Closing Adjustment Statement to Buyer, together with all records or data supporting the calculation of amounts presented on the Closing Adjustment Statement, no later than five (5) business days prior to the scheduled Closing Date. Prior to the Closing, Buyer and Seller shall review the adjustments proposed by Seller in the Closing Adjustment Statement and shall work in good faith to arrive at agreed adjustments. Agreed adjustments shall be taken into account in computing any adjustments to be made to the Base Purchase Price at the Closing. To the extent actual figures are not available, estimates shall be used subject to final adjustments as described in Section 4.4 below.

. . . .

4.4 Post-Closing Adjustments. A post-closing adjustment statement (the **"Post-Closing Adjustment Statement"**) shall be prepared and delivered by Seller to Buyer within ninety (90) days after the Closing, proposing further adjustments to the calculation of the Purchase Price based on the information then available. Seller or Buyer, as the case may be, shall be given access to and shall be entitled to review and audit the other Party's records pertaining to the computation of amounts claimed in such Post-Closing Adjustment Statement. Within fifteen (15) days after receipt of the Post-Closing Adjustment Statement, Buyer shall deliver to Seller a written statement describing in reasonable detail its objections (if any) to any amounts or items set forth on the Post-Closing Adjustment Statement. If Buyer does not raise objections within such period, then the Post-Closing Adjustment Statement shall become final and binding upon the Parties at the end of such period. If Buyer raises objections, the Parties shall negotiate in good faith to resolve any such objections. If the Parties are unable to resolve any disputed item within (15) days after Buyer's receipt of the Post-Closing Adjustment Statement, any such disputed item shall be submitted to a nationally recognized independent accounting firm mutually agreeable to the Parties who shall be instructed to resolve such disputed item within thirty (30) days. The resolution of disputes by the accounting firm so selected shall be set forth in writing and shall be conclusive, binding upon the Parties and non-appealable, and the Post-Closing Adjustment Statement shall become final and binding upon the Parties on the date

of such resolution. The fees and expenses of such accounting firm shall be paid one-half by Buyer and one-half by Seller. After the Post-Closing Adjustment Statement has become final and binding on the Parties, Seller or Buyer, as the case may be, shall pay to the other such sums are due to settle accounts between the Parties due to difference between the estimated Purchase Price paid pursuant to the Closing Adjustment Statement and the actual Purchase Price set forth on the Post-Closing Adjustment Statement.

Article 14 provides that Sundance as the Seller "SHALL TO THE FULLEST EXTENT PERMITTED BY LAW, RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS BUYER . . . FROM AND AGAINST . . . . ALL LOSSES ARISING FROM OR COMPRISING THE RETAINED LIABILITIES." Further, "Seller shall be obligated to indemnify Buyer under Section 14.1(c) for any Loss arising from the Retained Liabilities for a period in perpetuity."

Cathy Anderson testified that she was the Chief Financial Officer of Sundance at the time NRP made its requests for indemnification, however she was not involved in negotiating or drafting the PSA. Anderson testified that Sundance paid NRP's initial request for indemnification because it was very close to the deadline allowed in the PSA for post-closing adjustments and they "were trying to not cause an issue," although they believed that the charges "should have [been] included" in any post-closing adjustments. After receiving NRP's second request for indemnification, Sundance began to "really dig[] into the details and look[] at what was coming through." Anderson explained that the PSA provided that

9

Sundance would continue to cover "drilling and completion costs" for the wells that had been drilled close to the effective date of the PSA. And after "digging in[]", Sundance realized "other" charges that did not concern drilling and completion were "coming through." Sundance then hired a "joint interest auditor" to research the charges in the additional JIBs for which NRP sought reimbursement.

According to Anderson, Sundance ultimately rejected NRP's request for reimbursement for the remaining amounts. And Anderson sent Hartz a letter, a copy of which was admitted into evidence at trial, explaining Sundance's reasoning behind refusing to reimburse NRP. That letter, in part, reads as follows:

> We have completed our review of the supplemental billings from EOG you sent us beginning last July. After analyzing the specific items and reviewing the PSA, we have concluded that Sundance does not have responsibility for these billings, and so we respectfully decline your request to reimburse NRP for them. I will explain our thinking.
>
> First, $301,503 of the charges related to the installation of facilities, such as tanks, gathering lines, etc. Facilities costs are not "drilling and completion costs" and Sundance never agreed to retain liability for facilities costs . . . .
>
> Second, the remaining $606,063 of the JIBs do cover costs that would be classified as drilling and completion costs, but we think that responsibility for those costs was finally settled between the parties at final settlement. We base this conclusion on the language in Section 4.4 of the PSA, which states that the Post-Closing Adjustment Statement shall be "final and binding" on the parties either if not challenged or following resolution of any challenge by the accounting firm. Section 4.1 of the PSA provides for settling allocations of costs

between the parties on a preliminary basis at closing based on estimates, "subject to final adjustments as provided in Section 4.4 below." We think the PSA is clear that the settlement of Property Expenses in the Post-Closing Adjustment Statement was final and binding on the parties.

With respect to the letter, Anderson testified that everyone agreed that final was final." She testified that they "all signed the final post-closing settlement statement," which "ended it and that was what was the agreement of the parties." She further explained that Sundance could have, and should have, sought an adjustment for the amount it seeks in an offset, but that it did not realize its oversight until after the time for adjustment under the PSA had passed. Anderson admitted that there was no language in the PSA's Article 14 indemnification that appeared to limit NRP's right to indemnification based on the post-closing adjustment period.

After deliberating, the jury returned a verdict on liability in favor of NRP as follows:

**Question No. 1:**

**Did Sundance fail to comply with the PSA?**

Answer "Yes" or "No."

Answer: ___YES___

. . . .

11

**Question No. 2:**

**Was Sundance's failure to comply excused?**

Answer "Yes" or "No."

Answer:    NO

. . . .

**Question No. 3:**

**What sum of money, if any, if paid now in cash, would fairly and reasonably compensate NRP for its economic damages, if any, that resulted from Sundance's failure to comply with the PSA?**

. . . .

Answer:    $988,254

**Question No. 4:**

**Do you find Sundance is entitled to any offset of any amounts found by you in response to Question No. 3?**

Answer "Yes" or "No."

Answer:    NO

The parties agreed to try the attorney's fee portion of the case to the bench. After the jury returned its verdict, the trial court adjourned the trial on attorney's fees until a time when the parties were able to reconvene. Originally, NRP set the hearing for a determination of attorney's fees for October 20, 2017. On October 16, 2017, Sundance filed objections to NRP's failure to properly disclose its attorney's fees witnesses and evidence. NRP reset the hearing twice, and the

12

attorney's fees issue was tried to the bench on January 12, 2017—nearly six months after the initial trial had begun.

At the hearing, the trial court decided to admit NRP's attorney's fees testimony and other evidence, despite its untimely disclosure. Pursuant to Texas Rule of Civil Procedure 193, the trial court determined that there was no unfair surprise or prejudice to Sundance in admitting NRP's evidence and testimony on the issue of attorney's fees, considering, among other things, that Sundance had the invoices for one hundred days before the hearing and the disclosures were made seventy-four days before the hearing. The trial court also offered Sundance a continuance of the hearing to allow it to "conduct any additional discovery into the subject matter of the attorney['s] fees" that was to be addressed at the hearing. Sundance did not seek a continuance.

Matthew Henneman, an attorney for NRP, testified that he has been licensed in the State of Texas for approximately 23 years, he has tried multiple jury trials and arbitrations in Harris County and consistently handles "large complex commercial litigation and contract disputes." He further testified that he is familiar with the "reasonable, customary, and necessary attorney['s] fees charged in cases of this type by attorneys practicing in Harris County[,] Texas and the surrounding area." Henneman testified that he was with the firm that represented NRP in this case and is familiar with the case. The standard hourly rate for a partner, such as

Henneman, at his firm is between $525 and $575 per hour and the hourly rate for an associate is between $235 and $400 per hour, "depending on experience and other factors."

Henneman reviewed the entire file for the case, including all "timekeepers" who worked on the case. The largest amount of time billed in this case by NRP's attorneys was attributed to "review of [and] examination of the agreements between NRP and Sundance, which was the core element and core dispute in th[e] case." NRP's attorneys also reviewed the pleadings, drafted discovery requests and discovery responses, and participated in multiple depositions and conferences. Further, attorneys spent time preparing "dispositive motions," "various pleadings," and other motions, preparing for trial, and trying the case. Henneman explained that he considered the time involved, the skill needed to prosecute the case, other work that the attorneys could not have taken on because they were fully engaged on this case, the fee regularly charged by the firms and in Harris County, Texas for cases of this nature, as well as the amount involved in the verdict—which was over $900,000. He further considered the nature of the attorney's relationships with the clients. And based "on those factors," it was his "opinion that the fees charged in this matter [by NRP's attorneys were] reasonable, customary, and necessary for this type of matter." And, although a lot of the discovery that was conducted was not ultimately used at trial, Henneman testified that the amount of discovery

14

conducted was necessary to do a thorough and complete job litigating the case for NRP.

Further, Henneman discounted the fees by twenty-five percent to account for the work performed on the declaratory-judgment claim, for which fees were not recoverable and which was dropped by NRP before trial. He also explained that the median rate charged for commercial litigation in the State of Texas in 2015 was $295 per hour. Because this was "not a median rate case," he recommended that the rate applied "be increased to $350 per hour in this matter."

Overall, Henneman concluded that NRP's recoverable attorney's fees were $396,007.75. He explained that he reached this conclusion by multiplying the number of hours worked on the case—1,137.15—by the rate of $350 per hour. He then subtracted amounts attributed to the declaratory-judgment claim. Henneman further testified that "an intermediate appellate court appeal would cost approximately $50,000" and an appeal to the Texas Supreme Court would "also cost a similar amount."

Phillip Sharp testified as Sundance's rebuttal witness on the issue of attorney's fees. He testified that he has tried more than thirty jury trials and at least ten bench trials and is familiar with the fees charged by lawyers in the Houston legal community. Sharp testified that he did not disagree with the hourly rates charged by NRP's attorneys, but that "a good deal of the work was not necessary"

15

and, thus, the charges overall were unreasonable. More specifically, he testified that, in his opinion, "this case sets the record for the most documents produced in discovery that didn't have anything in the world to do with the trial." He explained that the amount of discovery conducted was extremely excessive given it only took NRP one day to put on its entire case-in-chief. He also testified that the time of the attorney who was involved in drafting and negotiating the PSA on behalf of NRP, and who stayed involved and talked to people during trial, should not be recoverable by NRP because "the deal lawyer's fees" should not be recoverable for a subsequent trial on the subject-matter. Instead, Sharp opined that he would expect reasonable attorney's fees in this case to be closer to one-half of those requested by NRP or around $200,000. Sharp also admitted that he had reviewed a great number of documents produced in the case and that Sundance did not file a motion for protection related to the discovery requests served by NRP.

Following the bench trial on attorney's fees, the trial court entered judgment in favor of NRP, awarding NRP damages against Sundance in the amount of $988,254, without allowing for any offset. It further awarded NRP attorney's fees in the following amounts:

(1) $396,007.75 for representation through trial;

(2) $50,000.00 for representation through appeal to the court of appeals; and

(3) $50,00.00 for representation through an appeal to the Supreme Court of Texas.

Sundance filed a motion for judgment notwithstanding the verdict, arguing, among other things, that the "attorney[’s] fees evidence was improper and should have been stricken by the trial court" for failure to timely disclose the evidence, that the evidence of attorney's fees was legally and factually insufficient to support the attorney's fees award, and that the evidence was legally and factually insufficient to support the jury's damages award because the jury failed to award an offset, of which the evidence was uncontroverted. The trial court denied Sundance's motion for judgment notwithstanding the verdict.

**Standard of Review**

When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex. App.—Dallas 2012, no pet.). Under such circumstances, we will sustain a legal sufficiency or "no-evidence" challenge if the record shows any one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d

17

802, 810 (Tex. 2005). In contrast, when an appellant attacks the legal sufficiency of a finding on which it bore the burden of proof, it must show not only that no evidence supports finding, but also that the evidence conclusively proves the contrary. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). Under this standard, we reject the challenge unless the evidence proves all vital facts in support of the challenger's position as a matter of law. *Id.* at 624. Regardless of who bears the burden of proof, in conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *City of Keller*, 168 S.W.3d at 822.

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (internal quotations omitted). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within th[e] zone of reasonable disagreement." *Id.*

18

When an appellant attacks the factual sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In conducting a factual-sufficiency review, we examine, consider, and weigh all evidence that supports or contradicts the fact finder's determination. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We note that the fact finder is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The fact finder may also resolve inconsistencies in the testimony of any witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). We set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

**Sufficiency of the Evidence**

**A.      Attorney's fees**

In its first issue, Sundance argues that the evidence is legally and factually insufficient to support the trial court's award of attorney's fees to NRP.

**1.      Untimely disclosures**

In a portion of its first issue, Sundance asserts that the trial court "failed to exclude documents supporting NRP's attorney['s] fees evidence because NRP failed to timely produce them."   It further asserts that because NRP's evidence regarding its attorney's fees should have been excluded, it constitutes no evidence to support the trial court's award of attorney's fees to NRP.

We review whether a trial court erred in making an evidentiary ruling for an abuse of discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007).  A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).  We will uphold a trial court's evidentiary ruling if any legitimate ground supports the ruling, even if the ground was not raised in the trial court. *Hooper v. Chittaluru*, 222 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).  And we will not reverse an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment or prevented a proper presentation of the appeal. *See* TEX. R.

20

APP. P. 44.1(a); *Sw. Elec. Power Co. v. Burlington N. R.R. Co.*, 966 S.W.2d 467, 474 (Tex. 1998). In determining whether the erroneous admission or exclusion of evidence probably resulted in the rendition of an improper judgment, we review the entire record, and "[t]ypically, a successful challenge to a trial court's evidentiary ruling[] requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

Texas Rule of Civil Procedure 193.6(a) provides that "[a] party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed . . . ." TEX. R. CIV. P. 193.6(a). However, a trial court may admit untimely disclosed evidence upon a showing of "good cause" or that use of the evidence would not "unfairly surprise or unfairly prejudice" the other party. *Id.* 193.6(a)(1), (2). The burden of "establishing good cause or the lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence or call the witness." *Id.* 193.6(b). And "[a] finding of good cause or the lack of unfair surprise or unfair prejudice must be supported by the record." *Id.* However, even if the party seeking to introduce the evidence at issue does not carry its burden of establishing the grounds for the exception, the trial court "may grant a continuance or temporarily postpone the trial to allow a response to be made, amended, or

21

supplemented, and to allow [the] opposing part[y] to conduct discovery regarding any new information presented by that response." *Id.* 193.6(c).

In this case, the trial court specifically made a finding of no unfair surprise or unfair prejudice. Additionally, the trial court offered a continuance to Sundance in order to allow it "to conduct any additional discovery into the subject matter of the attorney['s] fees" that was raised by the untimely disclosure. Sundance declined a continuance, and the trial court overruled Sundance's objection and request to exclude NRP's evidence of attorney's fees based on its untimely disclosure.

On appeal, Sundance asserts that a continuance in this case would not have remedied the unfair surprise or prejudice. However, its assertion is based solely on the bifurcation of the liability and attorney's fees portions of the trial and the trial court's alleged failure to timely reconvene the trial to address the outstanding issue of attorney's fees. But the record indicates that Sundance agreed to the bifurcation of the case and to try the issue of attorney's fees to the trial court. And Sundance does not assert that it opposed the allegedly unreasonable delay in commencing the trial in the trial court, nor does it present any error of that nature to this Court.

Based on the record below and the arguments presented on appeal, we cannot conclude that the trial court's offer of a continuance was insufficient to remedy any unfair prejudice to Sundance. Accordingly, having refused the trial

court's offer a continuance pursuant to Texas Rule of Civil Procedure 193.6(c), Sundance cannot now argue that it suffered unfair prejudice by the admission of NRP's attorney's fees evidence. *Santos v. Comm'n for Lawyer Discipline*, 140 S.W.3d 397, 404 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (party "can hardly be heard to argue that he was unfairly prejudiced" after declining trial court's offer of continuance to conduct discovery on new information); *see also, e.g., Hilburn v. Providian Holdings, Inc.*, No. 01-06-00961-CV, 2008 WL 4836840, at *11 (Tex. App.—Houston [1st Dist.] Nov. 6, 2008, no pet.) (mem. op.) (holding admission of expert testimony on attorney's fees not abuse of discretion, despite untimely disclosure, where opponent of evidence refused offer of further discovery and did not demonstrate offer insufficient).

Accordingly, we hold that the trial court did not err in admitting NRP's attorney's fees evidence.

We overrule this portion of Sundance's first issue.

### 2. Reasonable and necessary

In the remaining portion of its first issue, Sundance asserts that even if we do not determine that the trial court erred in admitting NRP's attorney's fees evidence, the evidence is legally and factually insufficient to support the trial court's attorney's fees award "pursuant to what is allowable under Texas law."

The reasonableness of an attorney's fee award is evaluated by considering the following factors: (1) the time and labor required, novelty, and difficulty of the question presented and the skill required to properly perform the legal service; (2) the likelihood that the acceptance of employment precluded other employment by the attorney; (3) the fee customarily charged in the locality for similar services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the attorney performing the services; and (8) whether the fee is fixed or contingent. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997); *McMahon v. Zimmerman*, 433 S.W.3d 680, 693 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Further, "[t]rial judges can draw on their common knowledge and experience as lawyers and as judges in considering the testimony, the record, and the amount in controversy in determining attorney's fees." *Zimmerman*, 433 S.W.3d at 693 (internal quotations omitted); *see also In re Guardianship of Hanker,* No. 01-12-00507-CV, 2013 WL 3233251, at *5 (Tex. App.—Houston [1st Dist.] June 25, 2013, no pet.) (holding trial judge may "draw[] on her knowledge of the case, review of the court file, and her experience in other . . . proceedings in determining whether a requested fee is reasonable").

Detailed invoices of the work performed by NRP's attorneys were admitted into evidence at trial along with the expert testimony of Henneman, an attorney for NRP.

Henneman testified that he has been licensed in the State of Texas for approximately 23 years, he has tried multiple jury trials and arbitrations in Harris County and consistently handles "large complex commercial litigation and contract disputes." He further testified that he is familiar with the "reasonable, customary, and necessary attorney's fees charged in cases of this type by attorneys practicing in Harris County[,] Texas and the surrounding area." Henneman testified that he was with the firm that represented NRP in this case and is familiar with the case, attorneys who worked on the case, and the hourly rates charged for the work performed by those attorneys.

Henneman reviewed the entire file for the case and explained that the largest amount of time billed in this case by NRP's attorneys was for "review of [and] examination of the agreements between NRP and Sundance, which was the core element and core dispute in this case." NRP's attorneys also reviewed the pleadings, drafted discovery requests and discovery responses, and participated in multiple depositions and conferences. Further, attorneys spent time preparing "dispositive motions," "various pleadings," other motions, as well as preparing for trial and trying the case. Although a lot of discovery that was conducted was not

used at trial, Henneman testified that the nature of discovery was necessary to do a thorough and complete job working up the case for NRP. Henneman also considered the time involved, the skill needed to prosecute the case, other work that the attorneys could not have taken on because they were fully engaged on this case, the fee regularly charged by the firms and in Harris County, Texas for cases of this nature, as well as the amount involved in the verdict—which was over $900,000. He testified that in his opinion the fees charged by NRP's attorneys were reasonable, customary, and necessary.

Henneman concluded that the total reasonable number of hours worked on the case was 1,137.15. He multiplied the number of hours by an adjusted-median billable rate of $350 per hour and discounted the fees by twenty-five percent for work performed on the declaratory-judgment claim, for which fees were not recoverable and which was dropped by NRP before trial. Based on this analysis, Henneman determined that NRP's reasonable recoverable attorney's fees were $396,007.75. He additionally opined that "an intermediate appellate court appeal would cost approximately $50,000" and an appeal to the Texas Supreme Court would "also cost a similar amount."

Sharp testified as Sundance's rebuttal witness on the issue of NRP's attorney's fees. He opined that the hourly rates charged by NRP's attorneys were reasonable, but that the overall charges were unreasonable because, with regard to

discovery, "a good deal of the work was not necessary." He explained that he believed the amount of discovery conducted was excessive given the few documents actually used as exhibits at trial and that it only took NRP one day to put on its case-in-chief at trial. Sharp opined that he would expect reasonable attorney's fees for NRP in this case to be closer to $200,000.

Based on our review of the record, we conclude that there was legally and factually sufficient evidence to support the trial court's award of attorney's fees to NRP. The detailed invoices and Henneman's testimony concerning the fees charged and work performed in this case were some evidence in support of the award, satisfying the legal sufficiency requirement. *Zimmerman*, 433 S.W.3d at 694; *see also City of Keller*, 168 S.W.3d at 827. Further, given the record, the trial court's award of attorney's fees in this case is not so clearly wrong or manifestly unjust to require reversal for factual insufficiency. This is a complex-commercial litigation case involving a fully-litigated breach of contract claim related to a PSA to purchase $35 million of oil and gas assets. There are detailed billing records as well as Henneman's testimony regarding the total hours billed, how he reduced those hours to account for the inability to recover for work performed on the declaratory-judgment claim, his and the other attorney's billable rates, the standard billable rate in the community and what billable rate should be applied in this case, and the trial court could take judicial notice of the standard and customary fees as

27

well as the content of the case file. *Zimmerman*, 433 S.W.3d at 694 (citing *Cain*, 709 S.W.2d at 176).

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's award of attorney's fees in this case.

We overrule the remaining portion of Sundance's first issue.

### B.    Offset

In its second issue, Sundance argues that the evidence is legally and factually insufficient to support the jury's damages ward because "the jury failed to account for uncontroverted evidence of Sundance's right to an offset."

The alleged "uncontroverted" evidence relied upon by Sundance is testimony from Anderson that NRP's damages included amounts for items that were not part of Sundance's Retained Liabilities in the amount of $382,000. At trial and on appeal, Sundance's argument that it is entitled to an offset of damages is premised upon Section 4.4 of the PSA.[1] Section 4.4 required Sundance to prepare—which it did—a post-closing adjustment statement within ninety days of closing "proposing further adjustments to the calculation of the Purchase Price based on information then available." And Anderson testified that the $382,000

---

[1]    To the extent that Sundance would argue it was entitled to an offset based on Article 14 of the PSA, that argument is not properly briefed or raised and, thus, waived. *See* TEX. R. APP. P. 38.1.

28

offset was not included on the post-closing adjustment statement because it was just missed, but she wished it had been included.

Accordingly, there is nothing in Anderson's testimony that would establish Sundance's right to an offset pursuant to Section 4.4. It is undisputed that Sundance did not request an adjustment to the purchase price in its post-closing statement for the amount it now requests to be offset because it did not catch the alleged error in time. And it is indisputable that more than ninety days have passed since the closing on the PSA.

We are additionally unpersuaded by Sundance's argument that NRP's damages were only recoverable pursuant to Section 4.4 and not the indemnity provision in Article 14, and, thus, it should be allowed an offset pursuant to Section 4.4. The record demonstrates that NRP brought a breach of contract claim against Sundance based on Sundance's failure to indemnify it for assumed liabilities pursuant to Article 14 of the PSA, as it was required to do in perpetuity. This was the same theory pursued by NRP at trial. The jury found that Sundance breached the PSA and Sundance does not challenge this finding. The jury further found that Sundance was not entitled to an offset of damages. To the extent that Anderson testified that any of the damages sought by NRP were not recoverable under the Article 14 indemnification provision, this evidence was controverted by the testimony of Hart which supported NRP's theory that those damages do fall

under the indemnification provision. As such, Anderson's testimony in that regard is not uncontroverted. And, in a jury trial, "[j]urors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary." *City of Keller*, 168 S.W.3d at 819.

Thus, we conclude that the record lacks any evidence that Sundance is entitled to an offset as requested. Accordingly, we hold that the evidence is factually and legally sufficient to support the jury's damages award.

We overrule Sundance's second issue.

## Conclusion

We affirm the judgment of the trial court.


Julie Countiss
Justice

Panel consists of Justices Lloyd, Landau, and Countiss.

30